1

2

3

4

5

6

7

8

9               IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12  CONSERVATION CONGRESS; CITIZENS    )
    FOR BETTER FORESTRY; MARY LEE      )    2:08-cv-2483-GEB-DAD
13  STEFFENSEN; and KAREN WILSON,      )
                                       )    ORDER
14              Plaintiffs,            )
                                       )
15         v.                          )
                                       )
16  UNITED STATES FOREST SERVICE,      )
                                       )
17              Defendant.             )
    ───────────────────────────────── )

18

19         On May 4, 2009, a hearing was held on cross-motions for

20  summary judgment at which Plaintiffs argued "there is a likelihood"

21  they will suffer irreparable harm if Defendant's planned forest

22  thinning project in the Shasta-Trinity National Forest is not enjoined

23  by a preliminary injunction.  Plaintiffs argue this project violates

24  the National Environmental Policy Act ("NEPA") because Defendant

25  failed to disclose in an Environmental Assessment ("EA") the

26  environmental impacts of the project; and that these impacts required

27  Defendant to prepare an Environmental Impact Statement ("EIS").

28  Plaintiffs also seek summary judgment on their claims that Defendant

violated the National Forest Management Act ("NFMA") by failing to
monitor for certain species in the project area under the Land and
Resource Management Plan ("LRMP") and by only analyzing generalized
habitat "assemblages" instead of providing monitoring information and
analysis on relevant management indicator species ("MIS").

Defendant seeks summary judgment on all of Plaintiffs'
claims.

<u>I. Facts and Prior Proceedings</u>

The project is located on the Yolla Bolla District, South
Fork Management Unit, in the Shasta-Trinity National Forest.  The
project is to "thin[] from below approximately 930 acres of
overcrowded forest through timber harvest with associated fuels hazard
reduction activities."  (AR 142)  Defendant states: "The project is
needed to develop and maintain vigorous and healthy mixed conifer
stands that will be resilient to natural disturbances, the most
influential of which is wildfire."  (AR 157)  The project area
includes habitat suitable for nesting/roosting and foraging by the
Northern Spotted Owl, which is listed as threatened under the
Endangered Species Act.

During the May 4 hearing, Plaintiffs argued they are
entitled to have a preliminary injunction issued immediately because
they expect to suffer irreparable harm of "loss of the fisher habitat,
[and] the loss of canopy closure in particular . . ."  should the
logging begin in May 2009. (Rep.'s Tr. ("RT") at 5:21-24)

Defendant countered its best estimate of the project
commencement date is that trucks would not be able to access the
project area until the beginning of June. (RT at 41, 42) Further

1  Defendant offered to provide Plaintiffs at least one week notice prior
2  to beginning any work.

3          This is the second time Defendant's forest-thinning project
4  has been before this Court.  The Ninth Circuit reversed the district
5  court decision in the first case holding that the EA did not analyze
6  an adequate range of alternatives and that Defendant "violated NFMA by
7  failing to sufficiently analyze by proxy whether a diverse population
8  of wildlife . . . that includes the Pacific fisher, will remain in the
9  planning area after implementation [of the] forest-thinning project."

10          Therefore, the district court's decision was reversed and
11  the case remanded "with instructions to enter summary judgment in
12  favor of [the suing Defendant in the first case]."  Further, the
13  district court was instructed "to enjoin the project until [Defendant]
14  . . .  completed a new environment assessment consistent with [the
15  Ninth Circuit's] disposition."

16          The parties reference the first case as East Fork I Project,
17  and the case sub judice as East Fork II Project.  Defendant did
18  another EA for the East Fork II Project, which includes an expanded
19  range of considered alternatives and additional information supporting
20  its habitat analysis.  At issue is the sufficiency of Defendant's
21  analysis.

22                          II. Standard of Review

23          Agency decisions that allegedly violate NEPA and
            NFMA are reviewed under the Administrative
24          Procedure Act ("APA") and may be set aside only if
            they are arbitrary, capricious, an abuse of
25          discretion, or otherwise not in accordance with
            law. Although our review under this standard is
26          deferential, the agency must nonetheless
            articulate a rational connection between the facts
27          found and the conclusions made.

28

1  <u>Lands Council v. Martin</u>, 529 F.3d 1219, 1225 (9th Cir. 2008)(quoting

2  <u>Natural Res. Council Fund v. Goodman</u>, 505 F.3d 884, 888-89 (9th Cir.

3  2007)).  "Review under the arbitrary and capricious standard is narrow

4  and the reviewing court may not substitute its judgment for that of

5  the agency." <u>W. Radio Servs. Co. v. Espy</u>, 79 F.3d 896, 900 (9th Cir.

6  1996) (citing <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360,

7  376 (1989)).  "[A court] may reverse the agency's decision as

8  arbitrary or capricious only if the agency relied on factors Congress

9  did not intend it to consider, entirely failed to consider an

10  important aspect of the problem, offered an explanation that ran

11  counter to the evidence before the agency, or offered one that is so

12  implausible that it could not be ascribed to a difference in view or

13  the product of agency expertise." <u>Id.</u>

III.  Analysis

15  A.   <u>NFMA Claims</u>

16       Each movant seeks summary judgment on the NFMA claims.

17  Plaintiffs argue the NFMA, through the LRMP, requires Defendant to

18  monitor the site-specific impact on Management Indicator Species

19  ("MIS"), and that "[t]he EA fails to sufficiently disclose and analyze

20  the project's effects on Pacific fisher." (Pls. Mot. 22:14-19.)

21  Defendant counters, "nowhere in the NFMA or its regulations is there

22  any requirement that the [defendant] conduct population monitoring of

23  'management indicator species'. . ."; that its habitat assemblages

24  analysis complies with the requirements of both the NFMA and the LRMP;

25  and, that it has complied with the NFMA by thoroughly analyzing the

26  Pacific fisher's habitat, as evidenced by the Pacific fisher addendum

27  analysis. (Defendant's Memo at 17:11-14)

28  / / /

1      1.   <u>Habitat Assemblages Monitoring</u>

2          Plaintiffs contend "[D]efendant violated NFMA by failing to

3  provide monitoring information or analysis of the effects of the sale

4  on the relevant MIS, and by simply analyzing the health of generalized

5  habitat assemblages.  Plaintiffs point to sections of the LRMP's

6  Monitoring Action Plan and argue they require population monitoring.

7  For example, Plaintiffs argue that the LRMP's requirement to

8  "determine population and habitat trends" for certain species (AR

9  3999), and that "[f]orest personnel will continue to survey for

10 additional populations and habitats of [threatened, endangered, and

11 sensitive] species," mandate monitoring the actual species

12 populations. (AR 3800)

13         Defendant counters neither the NFMA nor the LRMP Monitoring

14 Action Plan require project-level monitoring; and, it "has

15 consistently interpreted" the Monitoring Action Plan's Indicator

16 Assemblage guidance [as] not designed or intended for project-level

17 monitoring," and its "interpretation of its own forest plan is

18 entitled to deference." (Defs. Mot. 17:22-28; 18:1-3)

19         The NFMA requires Defendant "to provide a framework to

20 contribute to sustaining native ecological systems by providing

21 appropriate ecological conditions to support diversity of native plant

22 and animal species in the plan area."  36 C.F.R. § 219.10.  The LRMP

23 allows Defendant to "[u]se appropriate indicator species or habitat

24 components to represent the assemblage" in order to monitor wildlife.

25 (AR 3999); <u>See</u> <u>Lands Council v. Powell</u>, 395 F.3d 1019, 1036 (9th Cir.

26 2005) (citations omitted) ("[I]n appropriate cases . . . Forest

27 Service [is allowed] to avoid studying the population trends of the

28 Indicator Species by using Indicator Species habitat as a proxy for

1   Indicator Species population trends in a so-called 'proxy on proxy'
2   approach).

3           Defendant discussed its interpretation of the LRMP's
4   requirements in the Project EA, stating "[t]he LRMP does not require
5   that [Defendant] conduct fisher or marten population monitoring as
6   precondition to project implementation." (AR 259)  If the LRMP "plan
7   language is susceptible to more than one reasonable interpretation, we
8   defer to the agency's interpretation." Hells Canyon Allianc v. USFS,
9   227 F.3d 1170, 1180 (9th Cir. 2000).  "The LRMP specifies that
10  [Defendant] conducts field review of project planning using habitat
11  capability models which was completed and documented in the project
12  Pacific Fisher Report in the project record." (AR 259)  Defendant
13  prepared a "report document[ing] the effects of project alternatives
14  on the habitat components of selected assemblages." (AR 1431)  The
15  LRMP allows Defendant to monitor wildlife by "[using] appropriate
16  indicator species or habitat components to represent the assemblage."
17  (AR 3999)  The monitoring includes: the Goshawk, ("identify and
18  document habitat conditions in nest groves survey habitat and
19  determine occupancy and reproductive success") (AR 4000); and,
20  furbearers, ("[m]onitor furbearer network for occurrence and amount of
21  appropriate habitat attributes and/or special components; field review
22  of project planning using habitat capability models"). (AR 4001).
23  Defendant has determined "habitat and population trends" of many
24  species, (AR 3999-4001), and provides a sufficient habitat analysis.
25  See Native Ecosystems Council v. USFS, 428 F.3d 1233, 1250 (9th Cir.
26  2005) (stating the Court should be assured Defendant's "knowledge of
27  what quality and quantity of habitat is necessary to support the
28  species and [that] the Forest Service's method for measuring the

1 existing amount of that habitat are reasonably reliable and
2 accurate."); <u>Lands Council v. McNair</u>, 537 F.3d 981, 997-98 (9th Cir.
3 2008) ("We therefore hold that when the Forest Service decides, in its
4 expertise, that habitat is a reliable proxy for species' viability in
5 a particular case, the Forest Service nevertheless must both describe
6 the quantity and quality of habitat that is necessary to sustain the
7 viability of the species in question and explain its methodology for
8 measuring this habitat.").  Therefore, Defendant prevails on this
9 portion of its motion.

10      2.   <u>Pacific Fisher Monitoring Requirements</u>

11      Plaintiffs also contend the project violates the NFMA's
12 requirement that diversity of plant and animal communities be provided
13 since Defendant failed to monitor for the Pacific fisher population.
14 Plaintiff argues since the NFMA requires that "use and occupancy of
15 National Forest System lands shall be consistent with the LRMP, (16
16 U.S.C. § 1604(I)) "annual monitoring for actual occupancy" of the
17 [Pacific] fisher habitat is required, and Defendant's failure to meet
18 this requirement violates the NFMA.(Pls. Mot. 11:17-18).

19      Defendant counters neither the NFMA nor its regulations
20 specify precisely how Defendant must demonstrate that its
21 site-specific plans adequately provide for wildlife viability, and
22 contends that in its Addendum, the Assemblage Report, and the EA, it
23 performed a three-level analysis of the effects on Pacific fisher:
24 studies describing the quality and quantity of habitat necessary to
25 sustain the viability of Pacific fisher, determination of what habitat
26 is suitable for Pacific fisher, and what would be suitable after the
27 project. (Defs. Mot. 16-17:19-5)
28 / / /

1    Defendant's studies of the project's effects on the Pacific
2    fisher are reflected in the Pacific fisher addendum to the East Fork
3    II Timber Sale Wildlife Report, the Biological Evaluation, (AR
4    1370-86.), and the EA. (AR 204-07.)  Defendant determined that "the
5    project may impact [an] individual[] [Pacific fisher] but is not
6    likely to result in a trend toward federal listing or loss of
7    viability." (AR 1382.)  Further, Defendant determined that "[m]ost
8    fisher habitat in the assessment area will not be affected by the
9    project, [and that] about 95% of the existing suitable habitat would
10   be unaffected. (AR 205)  In addition, Defendant found that the "Fisher
11   habitat within project units will be modified . . . but current
12   habitat capability levels . . . will not change because key habitat
13   components will be retained (sufficient canopy closure LWD and
14   hardwoods)." Id.

15   Defendant has sufficiently examined the type of habitat used
16   by the fisher, the type of land the project will affect, and the
17   effect of East Fork II on fisher habitat.  Defendant's studies show
18   that Defendant's conclusion that the project "is not likely to result
19   in a trend toward federal listing or loss of viability" of the Pacific
20   fisher has a rational connection to facts in the record.  (AR 1382)
21   Therefore, Defendant prevails on this portion of its motion.

22   B.   NEPA Claims

23   Each party also seeks summary judgment on the NEPA claims.
24   Plaintiffs argue an EIS must be prepared because "'substantial
25   questions are raised as to whether [the] project ... may cause
26   significant degradation of some human environmental factor.'" Idaho
27   Sporting Congress v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998).
28   Plaintiffs contend the project will degrade the water quality of

1 | already-degraded watersheds, including well-functioning subwatersheds;
2 | it may significantly affect the coho salmon, listed under the
3 | Endangered Species Act, the Chinook salmon, and critical fish
4 | habitats; it "may adversely affect [essential fish habitat] for
5 | Pacific coast salmon," as determined by the National Marine Fisheries
6 | Service of the National Oceanic and Atmospheric Administration ("NOAA
7 | Fisheries"), (AR 1552); and, it may significantly affect the Northern
8 | Spotted Owl and its critical habitat.  Further Plaintiff argues the EA
9 | failed to consider the cumulative impacts of the timber harvest;
10 | failed to disclose all of the impacts of the timber harvest; does not
11 | disclose the impact on the Northern Spotted Owl since it failed to
12 | specify the diameter of trees to be harvested; failed to address the
13 | impact of the Project on the Pacific fisher and other MIS; and failed
14 | to disclose the Project's effect on water quality and riparian and
15 | aquatic habitat because Defendant ignored the recommendations of the
16 | Watershed Analysis.  Plaintiffs also argue Defendant should have
17 | prepared a supplemental NEPA analysis after discovering unforeseen
18 | environmental consequences from East Fork I.
19 |         However, Defendant's EA considered all the relevant factors
20 | and articulated a rational connection between the facts found and the
21 | choice made. '" <u>Northcoast Envtl. Ctr. V. Glickman</u>, 136 F3d 660, 666
22 | (9th Cir. 1998)(internal quotes and cite omitted).  As evidenced by
23 | the Pacific fisher addendum, Defendant rationally concluded that the
24 | effects of the project on the Pacific fisher is not likely to result
25 | in trend toward federal listing or loss of viability of the Pacific
26 | fisher.  (AR 1382) Further Defendant received input from the National
27 | Marine Fisheries Service of the National Oceanic and Atmospheric
28 | Administration ("NMFS") on the effects of the project on the coho

1  salmon and critical fish habitat. (AR 1543-55)  The NMFS determined
2  there would be no direct effects from the project on the coho salmon
3  because there were none located in the project area. (AR 1548)  The
4  NMFS also determined that "the indirect effects of the project on
5  SONCC coho salmon or critical habitat will be insignificant and/or
6  discountable.  (AR 1549)

7                          IV.  Conclusion

8          Defendant has shown its entitlement to summary judgment on
9  all of Plaintiffs' claims.  Therefore, Defendant's motion is granted
10 and Plaintiffs' motion is denied.  Judgment shall be entered in favor
11 of Defendant.

12 Dated:  June 4, 2009

13

14                          _____
                            GARLAND E. BURRELL, JR.
15                          United States District Judge